All right, please proceed. Thank you. Good morning, Your Honors, and may it please the Court. Mary Christine Sangaila, Pro Bono Counsel for Petitioner Fidel Mondragon-Alday, a gay man with a female gender identity, who we will refer to as Lucia, the name that he more closely identifies with. I will be presenting in the first seven minutes of opening, and my colleague will present in the remaining four minutes, and then we'd like to reserve four for rebuttal. All right. Well, that's very confusing, but why don't you go ahead and watch the numbers, and I'll try to help you out as well. Thank you very much, Judge. This appeal, as well as the two which follow it this morning, share a fundamental error, and that error is that the petitioners were deprived of an individualized, full assessment of their own record evidence concerning country conditions and the likelihood of future persecution and torture because of a misapplication of this Court's decision in Castro-Martinez. This error stems in all three cases from a conflation of gender identity with sexual orientation. As this Court observed in Hernandez-Montiel, gay men with a female gender identity constitute a particularized social group in themselves and face unique discrimination and persecution in Mexico because they identify as female in a machismo culture in which women are viewed as being more passive and men are faulted for not acting like men. In Lucia's case, the BIA wrongly relied on Department of State country reports concerning Mexico which discussed the treatment of gay men but contained no specific information about the treatment of transgender individuals. The BIA also failed to address the multiple news articles and other material that Lucia had submitted describing attacks and abuse by both police and private actors on transgender individuals in particular. These reports, like Lucia's own experience, included rapes and extortion by police and violent attacks by private individuals. And as the immigration equality brief that was presented to the BIA made clear, the most violent forms of homophobia in Mexico are directed towards transgender women and when perpetrated by the police are largely not prosecuted. In this particular case, the BIA affirmed an adverse credibility finding. What are we to do with that? Well, my colleague will address that point, the adverse credibility determination itself directly, but to your question of what does that affect, what part of the case does the adverse credibility determination affect, and I think that the case law is very clear that for future persecution on the CAT claim and withholding claim that the country reports, especially for the CAT claim, are independent evidence and adverse credibility determination does not have any effect on that. So the adverse credibility is focused on past persecution. No, I understand that. I'm trying to figure out that if we were to remand the matter, what is the scope of the remand? But I'll address that with your colleague. Now, getting to the country reports, the BIA as well as the government really relied on the discussions in the country report concerning new rights and increased tolerance for gay men, and they've conflated or extended those findings to the transgender population as well. Can you explain the differences between the two groups and the unique challenges and threat of persecution that transgender women may face that gay men may not face? Okay. Well, actually, I'd like to answer the question in two parts. The first part would be what impact do the reports have with regard to a change in law with regard to a group, and this court in the tug noted that this evidence or documentation of gay activism or new laws, those in themselves do not indicate that there's any less violence against a particular group. That's compounded here by the problem that we're talking about a different group with regard to transgender, a group that is, because of their visibility, more likely to be targeted, and also, as the evidence before the IJ showed, that there are different types of violence enacted upon gay individuals and transgender. The attacks with transgenders may be larger groups of people attacking all at once, putting the victims in a car and driving them around, that the police will often do the same kind of thing and extort money out of the transgender individuals in order to get released. Right, because the increased legal protections and increased tolerance may not extend to the transgender population. Correct. For example, your client's testimony that it was difficult for her to, or actually she couldn't obtain a job because of the way she dresses. Right. That wouldn't be a problem that's faced by gay men necessarily, right? Correct. Now, as I read the record here, the briefs, by far the government's best argument is that the federal government has passed legislation apparently protecting gay men, and that there was a march in Mexico City that was apparently heavily attended. There were 400,000 people there. And this is somehow inconsistent with your position that the climate with respect to transgender folks has not ameliorated. What do you have to say to that? Well, the first response is that activism and changes in laws do not go to the question at issue here, which is the particular kind of violence that was experienced by the petitioner. You can have laws, but those may not change societal perceptions or actions for a very long time. Also, there's additional evidence in the record that often, not only for being gay and transgender, but also being an activist, that you can be targeted and killed for protesting both police actions and individual action. There's one news report about a gay activist being stabbed to death at AR-316. So there is evidence of this in the record that I would say belies the suggestion that there's been great change, such that there would be no fear. What exactly did the legislation do? What were the terms of it? The legislation that's referred to in the country report and in the record has to do with gay marriages and adoptions. And that is only within the federal district in Mexico, which is Mexico City, and one other area in Mexico. So it is not even throughout the country. I'd also like to touch on, as well, another important aspect of this case, which is the due process aspect. We urge that the due process principles that were violated here require reversal for an entirely new hearing. As this court has recognized as both a statutory and constitutional matter, the IJ is required to develop the record in an immigration proceeding where, as here, the petitioners pro se. And as this court explained in Jacinto, this obligation includes explaining what's going to happen, what kind of evidence you need to present, providing the petitioner with an opportunity to put on an affirmative case, and enlisting favorable testimony. And here the IJ failed to fulfill any of these obligations. And unlike the asylum officer in Lucy's reasonable fear interview, who even failed to just offer a rudimentary explanation of what was going on and what would happen at the hearing, absent these violations, there is a potential that this would have affected the outcome of the proceedings, particularly with regard to the adverse credibility determination, which my colleague is going to address right now. All right. Thank you very much. Thank you. Good morning, Your Honors. Lindsay Martinez for Petitioner. Here, the BIA's adverse credibility determination was not supported by substantial evidence. Lucia's adverse credibility determination focused upon two purported inconsistencies. The first, Lucia's discussion of her rape by the Mexican police, was not an inconsistency or omission at all. Indeed, at her reasonable fear interview, under oath with the asylum officer, Lucia testified in response to a direct question that she had been raped at least 10 times by the Mexican police. This testimony is entirely consistent with that before the IJ, where Lucia only mentioned the rape in response to direct questioning. Lucia also explained that she did not mention the rapes because she was nervous. The IJ did not give any specific, cogent explanation, excuse me, reasons why Lucia's explanation was not reasonable under the circumstances and failed to address Lucia's explanation in her decision. Furthermore, the IJ should not have faulted Lucia for failing to volunteer details about her rape at the hands of the police because, as this court has found in most of the Mukasey and other cases, a woman who has suffered sexual abuse by government officials in her home country may be especially reluctant to reveal that abuse to government officials in this country, even when... It's certainly understandable that if you're a victim of sexual assault that you may not voluntarily disclose it or be reluctant to disclose it. What I struggle with in this case with regard to the adverse credibility finding is the fact that she did discuss the sexual assault by the police in the initial credible fear interview and when she appeared before the IJ she had multiple opportunities to talk about abuses by the police and she indicated in no uncertain terms that it was really fear that they would essentially capture and take her away if she didn't pay and concerns regarding fines. So if I read the record from AR 192 all the way through to 15216, there were multiple instances where the IJ gave her an opportunity to talk about what sort of problems she had with the police and isn't that sufficient for us under the standard review to find that substantial evidence supports the adverse credibility finding? No, Your Honor. In fact, Lucia's testimony before the asylum officer demonstrates her hesitance to volunteer details about this gruesome assault at the hands of the Mexican police. Before the asylum officer, Lucia similarly, in response to broad open-ended questions about generalized harm or problems with the police, responded that no, she didn't have such problems. It was only after repeated instances by the asylum officer at AR 395 to 396, like the IJ's testimony, it was only after several broad questions, once Lucia got to a direct question, have the police raped you, that she finally answered in the affirmative and that's entirely consistent with her testimony before the IJ, that she was reluctant to volunteer details about such a horrific abuse. But in some ways, the testimony in the credible fear interview was more horrific than before the IJ because she testified concerning repeated instances of assault. So if she were worried about retaliation back in Mexico where she required to return there, the damage had been done long before she got to the IJ. Well, Your Honor, the time lapse between the interviews was about five months, so it wasn't so far removed in time. And in any event, this court has held in Stoyanov that where an applicant gives one account of persecution and then revises the story so as to lessen the degree of persecution they experience rather to increase it, the discrepancy generally does not support an adverse credibility finding. We contend that that did not support an adverse credibility finding here. There are no other questions I'd like to reserve the rest of my time for rebuttal. All right. May it please the Court, Amy Carmichael for the Government. This case presents three main issues. First, the petitioner has not demonstrated that the Board erred in concluding that the numerous discrepancies in the various versions of her story rendered her not credible. Second, the credibility determination, which is the basis for denying both her withholding and cap claims, was not undermined by the immigration judge's conduct during her hearing. And finally, that the evidence of record does not compel the conclusion that there is a pattern or practice of persecution against homosexual men with female gender identities in Mexico. Why not? All right. In Castro-Martinez, on very similar evidence, the Court rejected the argument that there's a pattern or practice of persecution against homosexual men. Well, they're different. We're talking about different categories of people. Right. The Board's finding was not that Castro-Martinez was unequivocally binding.  What in the record undermines the evidence that transgendered individuals suffer systematic abuse at the hands of their neighbors and police in Mexico? Well, the evidence of record does show that Mexico has passed anti-discrimination laws. But not directed at this subcategory. Directed at different categories. That's like arguing that the fact that Mexico may have passed racial discrimination legislation is indicative of the fact that it intends to protect transgendered individuals. It's apples and oranges. The Mexican Constitution doesn't specifically say transgendered people, but it does say that you can't discriminate based on a number of different beliefs, including gender. Is there any mention in the country reports that the government and the BIA relied on regarding increased rights for the transgender population? One of the problems with the evidence of record is... Wait, just answer yes or no. Is there any mention of that? Because I want to make sure that I didn't miss it. And then you can go on and explain your answer. The evidence of record treats the transgender claims and homosexual claims together. And that's one of the problems. The Board didn't... Because that's a big problem, right? Because I think it is a problem. Was there an appreciation on the BIA's part that these are distinct groups that face different barriers? Granted, there's some overlap, but they are also distinct. Was there an appreciation of that fact? Well, the Board did specifically find that... Did explicitly reject petitioner's claim as a transgendered person, not as a gay man. And the evidence... I think the issue is that the evidence of record treats most of these claims together and doesn't treat the transgendered claim as a distinct claim. So you're conceding they dropped the ball because they're not the same. No, it's because when the Board is looking at the evidence, the evidence says transgendered and homosexual communities are seeing an improvement because the Mexican government is doing more to protect them. But the Board thought they were the same. Wasn't that an error? I don't think the Board thought that they were the same. We don't know what they thought. They certainly treated them as the same in their disposition of this case. I think the Board's citation to Castro-Martinez is really saying that to succeed, the petitioner had to demonstrate that things are worse for transgender individuals here than they were for Castro-Martinez as a gay man. And the record doesn't support that conclusion. It's similar types of evidence. I don't understand what you just said. I'm sorry, I just didn't follow it. I was very confused by that answer. Okay, so when you look at the type of evidence that was in Castro-Martinez, that was not sufficient to demonstrate that there was a pattern or practice of persecution against gay men. So the Board was looking for evidence that was greater than what was submitted in Castro-Martinez that was specific to the transgender community, and that didn't exist. Let me ask you this hypothetically. If we just take out of this equation the credibility issue, which is troublesome, she wins hands down, right? No, because the record would have to compel the conclusion that the problems for transgender people are so severe that the mere status of a transgender person is sufficient to meet her burden of proof. And what does the government think is illogical or illusory about that assertion? Is the government seriously arguing that transgender people working around in small Mexican rural towns have no problems? It's not that they have no problems, it's that... That they're targeted, that they're subject to abuse? I mean, is the government really seriously taking that on? Well, there's a number of issues. One does have to do with the protections that... The laws matter because government action is one of the requirements. It's not enough for harms to occur, the government has to be doing nothing about them. The police are raping her. Isn't that government action? Well, first of all, she hasn't established that. The police are employed by the government. What more does she have to show? Well, she would first have to show that she was credible. But the evidence of record is mixed on this issue, and you would have to conclude that no reasonable adjudicator could conclude anything other than that there was a pattern or practice. If someone were assaulted because she was transgendered by police, how could a reasonable adjudicator possibly conclude that that wasn't government-sponsored activity? By definition. Well, that's true for the individual, but that doesn't prove a pattern or practice of persecution. That's a much higher threshold. Setting aside the pattern and practice issue for a moment, I'm sure the government is well aware that if the BIA failed to appreciate the differences in the barriers faced by transgender individuals and gay men, for example, would the government concede that we would remand for reanalysis on that? If you find that the board failed to analyze evidence that it should have analyzed, then yes, remand is the appropriate outcome. So when she testified that she was unable to obtain employment at a factory because of her perceived sexual orientation and because she dresses in women's clothing, isn't that a barrier that's different than what the petitioner faced in Castro-Martinez, which is the linchpin of the government's argument on this issue? Well, again, that testimony was found not credible. So what we're only looking at for the question of the pattern or practice of persecution, we're only looking at the country reports. We can't look at her. Let's set aside the credibility issue for a moment, because there are some overlaps in the issues and analyses with regard to the three cases that we have today. I'm focusing now on the differences in barriers faced by transgender individuals versus the population of gay men, which was at issue in Castro-Martinez. Right. Well, there are differences between the populations. There are different barriers. But the evidence of record doesn't necessarily distinguish between them. That's not her problem. That's the BAI's problem. They're the ones that got confused. She wasn't confused. She has the burden of providing evidence that demonstrates that there's a pattern or practice. And the agency you're representing has the burden of understanding what's before it. They were confused. They just didn't get it. I don't think that the board was confused. Again, the board specifically examined her claim as a transgender individual. And the evidence of record that addresses transgender individuals does also address homosexual men. And she does identify as a- How so? Explain that to us, please. For example, the country report doesn't specifically address transgender issues separately from the homosexual issues that are in the country report. They're treated together in the country report. Do you allow the possibility that the populations are different and face different problems? Of course they're different and they face different problems. All right. But the evidence has to prove that transgender people will be persecuted on that basis alone. That's what we're looking at. And the evidence doesn't prove that. The evidence doesn't show that the government is systematically persecuting transgender individuals. That's the burden that she has to meet to succeed on this claim. A lot of stuff in the record about that. Maybe we're reading different records. The evidence demonstrates that the Mexican government is making an effort to promote tolerance. They pass laws to protect these communities, including anti-discrimination laws. You keep begging the question. You say these communities. Who are you talking about? That's the whole problem here. She has two claims. One is she is a gay man with a female gender identity. So it was an error for the board to also consider her status as a homosexual man because that is part of her claim. There's plenty of evidence submitted that indicates widespread violence against the gay and transgender community in Mexico. I don't see discussion before the BIA regarding those evidence. Very similar evidence was submitted in Castro-Martinez. I understand. We've been around with the Castro-Martinez presented different issues. But I think that the issue is that the evidence in Castro-Martinez demonstrated that there was still violence against the homosexual community. But the evidence also demonstrated that the government was making an effort. And because the government was making an effort, that wasn't enough for Castro-Martinez to meet his burden of proof. So I think the same thing is here. We focus just on the government's efforts or the effectiveness of those efforts as well? It's both. And did the BIA focus on the effectiveness of the government's efforts in this case? I think the board found that the evidence was insufficient to prove that there was a pattern of practice of persecution. So it's implicit in the finding. This is an important question. Did the board make any findings with respect to the efficaciousness of the government's efforts? Not specifically, no. And that's the problem I have with this record. You can talk about efforts all you want, but if it's not working, then that plays into the likelihood of persecution. And I don't see that the BIA really acknowledged. As the government can see, there's ample evidence in the record demonstrating widespread violence. And I don't see that the board really analyzed that. I think, again, that the main problem with the record is that she has the burden of proving that the problems are so severe that her status alone is sufficient to prove that it's more likely than not that she will be persecuted and that the government will be unable or unwilling to control those actors. So that's a very high threshold, and the court would here have to conclude that... What does the government think is going on with transgendered individuals in Mexico? That they're, what, ignored, they're welcomed with open arms, they are treated differently as a consequence of this legislation that doesn't cover the country and is directed to different populations? Help me understand. One of the problems is that the evidence does also indicate that it varies widely based on location. Things in Mexico City are very different than things in small towns. And where does she live? She lives in a small town. But she has to prove that for a pattern or practice of persecution, she has to demonstrate that it is countrywide. Anywhere she goes, she won't be safe. But isn't it the case that if we think the BIA failed to sufficiently consider record evidence that we remand for the BIA to take a look at that issue again in the first instance? Yes. All right. And in this case, I'm reading now from the BIA decision. They're talking about the 2010 country conditions, which indicates society's increasing acceptance of homosexual conduct. They gave a couple of examples. And the very next sentence is, we cannot conclude that the available record evidence support a conclusion of a pattern or practice. So there's the efforts. There isn't a discussion regarding efficacy. How do we read in those two sentences an implicit conclusion that the BIA properly weighed the evidence? Well, first of all, we assume that the BIA has done their job, unless there's evidence to the contrary, because we have the assumption of administrative regularity. Let's assume that ship just sailed. All right. Second of all, again, because the fact that the government is making an effort is extremely important when we're talking about a pattern or practice of persecution. It's less important for the individual claim. I raised three girls, and I told them all the time, don't confuse effort with results. Certainly, the fact that there's laws being implemented, the fact that there is some indication in the record of increasing tolerance of homosexual behavior, as the BIA says, certainly those are relevant factors to look at. But I'm trying to look at the record here and putting it in context to understand what the government's argument is when the BIA in two sentences says we're looking at the increasing tolerance as reflected in the record and then immediately jumping to, therefore, the record evidence doesn't support a pattern and practice. There's nothing in between, and I want to understand how the government reconciles that. Well, again, the fact of increasing tolerance suggests that it's not more likely than not for every single person, and that's what the pattern or practice of persecution standard is. The Jews in Nazi Germany, that's the pattern or practice standard. It's very high. It's systematic government. I don't think it's that high, but you're over time, so we can reserve this discussion. I understand you're on the next case as well, so we can continue this discussion when you come up for the next matter. All right. Let's hear from Petitioner's Council again. Just a few points. So first, and I believe this came through in the questioning, but that the new laws that are addressed in the BIA opinion do not have to do with transgender individuals. They have to do with gay marriage and adoption, so not this group. And then the record evidence also shows that, in fact, even for gay individuals, that there is a backlash against those changes in the laws, so that the change in the law may not only fail to yield results, but it can also yield an increase in violence against the very group the laws are attempting to protect. And the government's argument is that, yes, even though the BIA failed to discuss the widespread violence that's in the record, there's an implicit conclusion there. Are we able to determine that from the record? No, not at all. The fact that the BIA acknowledges that multiple news reports about transgender individuals and their experiences appeared in the record, and then leaping immediately to the country reports about gay individuals and the changes in the laws, and then saying, well, so now I find there's no pattern in practice, there's no analysis of the evidence concerning transgender individuals. It's completely skipped over and conflating the two groups. There is no contrary evidence in the record about a transgender experience that's any different from Lucia's, and, in fact, all of the record evidence shows that there is a systematic harm to transgender individuals because they are transgender, both by police and private individuals. And even though Lucia was pro se, she still managed to present quite a bit of evidence on this. And we would urge that, at the very least, we agree that there should be a remand in this case, at the very least. But we would also urge, first and foremost, a reversal and a grant of withholding in this case based on the evidence. All right. Thank you. Did your colleague wish to have a little bit of rebuttal time on the past persecution issue? Sure, if you want. All right. Why don't we put a minute on the clock? Let me ask you something. The BIA appears to, or the IJ appears to have made a general adverse credibility finding, and the BIA affirmed that. If we find that there's substantial evidence supporting the adverse credibility finding, is that a generalized adverse credibility finding, or can it be cabined to just the testimony regarding prior sexual assault by police officers? Well, Your Honor, if there is an adverse credibility finding, that that does weigh towards the applicant's entire testimony. However, here applicants must be given a reasonable opportunity to explain perceived inconsistencies, and the IJ must also address explanations that are given. Here, the inconsistencies articulated by the IJ and the BIA, first of all, Lucia was not given an appropriate opportunity to address these inconsistencies, but furthermore, she did explain that she was nervous. She was a pro se litigant. The IJ never addressed, as is required to do under the circuit's law, never addressed this explanation, and never gave Lucia an opportunity to give any other additional testimony about why there were these purported inconsistencies. So, on that basis, the adverse credibility determination should be reversed. All right. Thank you very much. Thank you. All right. We thank both sides for your arguments. The matter is submitted.
judges: Pregerson, Parker, Nguyen